ADAM L. BRAVERMAN
United States Attorney
BRUCE C. SMITH
Assistant U.S. Attorney
California State Bar No. 078225
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8266
E-mail: bruce.smith@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,      | Case No. '18CV2405 CAB AGS |
|---|---|
| Plaintiff,                     | COMPLAINT FOR FORFEITURE |
| v.                             | |
| $34,500.00 IN U.S. CURRENCY,   | |
| Defendant.                     | |

By way of complaint against the defendant $34,500.00 IN U.S. CURRENCY ("$34,500 in currency"), plaintiff UNITED STATES OF AMERICA alleges:

1. This Court has jurisdiction over this action by virtue of the provisions of Title 28, United States Code, Section 1355(a) and Title 21, United States Code, Section 881(a)(6), because the defendant $34,500 in currency constitutes money furnished or intended to be furnished in exchange for a controlled substance, or proceeds traceable to an exchange for controlled substances in violation of Chapter 13 of Title 21, United States Code.

2. Venue is proper in this district pursuant to

//

USAO:2018v00325:BCS/bfs

Title 28, United States Code, Section 1395 because the defendant $34,500 in currency was found in this district.

3. On April 17, 2018, in the Southern District of California, at the San Diego International Airport ("SDIA"), members of the San Diego Integrated Narcotics Task Force ("NTF") Commercial Interdiction Unit were on duty, seeking to intercept and seize controlled substances and proceeds from the sales of controlled substances passing though the airport.

   A. The Task Force officers ("TFO") were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used SDIA and the aircraft that arrived and departed there to distribute controlled substances throughout the United States.

   B. The Task Force officers were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used SDIA, and the aircraft that arrived and departed there, to transport drug sales proceeds and funds to be used to purchase drugs in and out of San Diego. Those proceeds and funds were usually in the form of United States currency.

   C. The Task Force officers were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of San Diego. SDIA and the aircraft that arrived

and departed there are relied upon as a means of sending and receiving such couriers.

    4. On or about April 17, 2018, NTF Task Force officers and Drug Enforcement Administration ("DEA") agents assigned to SDIA learned DWAYNE BRITT ("BRITT") was traveling from Savannah, Georgia to SDIA aboard American Airlines Flight 470.

    A. BRITT was traveling on a one-way ticket, purchased on the day of travel for cash.

    B. BRITT, a resident of Wilmington, Delaware, did not purchase a round trip ticket for his travel to San Diego.

    C. BRITT was traveling with one (1) piece of checked luggage.

    D. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug and drug currency couriers. They knew the purchase of a cross-country, one-way airline flight ticket even a day or two before departure is unusual, and can be indicative the traveler is an illegal drug or drug currency courier.

    E. The TFOs and DEA agents knew the general traveling public purchases round trip airline tickets weeks or even months in advance of the scheduled departure date. Advance purchase of round trip airline tickets results in lower fares for the traveler. Purchasing a one-way airline ticket even a week in advance of departure all but guarantees one will pay the highest fare.

    F. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug and drug

3

currency couriers. They knew illegal drug and drug currency couriers often times do not know when drugs or currency will be available for transport until the last minute. The nature of illegal drug trafficking, and its uncertainties, often compel couriers and their employers to purchase airline tickets close to the departure date.

   G. The TFOs and DEA agents were trained and experienced, and knew that San Diego is a primary source region for controlled substances cultivated and manufactured on the west coast of the United States ("west coast"), Latin America, and elsewhere.

   H. The TFOs and DEA agents were trained and experienced, and knew that controlled substances cultivated and manufactured on the west coast, in Latin America, and elsewhere were sent and distributed for resale from source regions such as San Diego to all points north and east within the United States. In their experience, the Savannah, Georgia region was a known destination market for controlled substances.

   5. The Task Force officers reviewed official United States, state, and local criminal history data bases, and learned BRITT had records of criminal activities in both Delaware and Georgia dating back to 2002 for, *inter alia*, possession of cocaine, a Schedule II Controlled Substance, with intent to distribute. BRITT also had an active misdemeanor arrest warrant issued in Delaware.

   6. The Task Force officers reviewed the DEA database and noted BRITT was identified as a cocaine courier.

4

7. The DEA database listed Shawn Truitt ("Truitt") as a criminal affiliate of BRITT.

  A. According to the passenger list for American Airlines Flight 470, Truitt was also aboard.

  B. Truitt was traveling on a one-way ticket, purchased on the day of travel for cash.

  C. American Airlines records confirmed that BRITT and Truitt purchased their respective tickets at the same time.

  D. Truitt, a resident of Delaware, did not purchase a round trip ticket for his travel to San Diego.

  E. American Airlines Flight 470 passenger records indicated Truitt had no checked luggage.

8. On April 17, 2018, just before 10:15 p.m. in SDIA Terminal Two, the TFOs and DEA agents prepared for the arrival of American Airlines Flight 470 and passengers BRITT and Truitt.

  A. At approximately 10:15 p.m., shortly after American Airlines Flight 470 landed, the TFOs and DEA agents, armed with a physical description and photo of BRITT gleaned from his criminal history documentation, identified him as he exited the jet way from Gate 30.

  B. The agents noted approximately 30 seconds after BRITT exited the aircraft, he was followed by fellow passenger and criminal associate Truitt.

  C. Although Truitt had no checked luggage, Truitt followed BRITT as BRITT walked to the luggage carousel area.

  D. Despite their history together, both being on

the same flight, and their common destination in the airport terminal, BRITT and Truitt had no contact with each other and maintained a distance from one another.

  E. The trained and experienced Task Force officers recognized the behavior of BRITT and Truitt as a measure of caution, counter surveillance, and a step taken to detect and evade law enforcement.

 9. TFO Santana and TFO Loochkartt, both dressed in plain clothes, followed BRITT and Truitt as they walked toward the luggage carousel area.

  A. TFO Santana and TFO Loochkartt watched BRITT retrieve a large black nylon roller bag from a carousel.

 10. Moments after BRITT harvested his large black nylon roller bag from the carousel, TFO Santana and TFO Loochkartt, approached BRITT, identified themselves as law enforcement officers, and showed him their respective law enforcement credentials.

  A. TFO Santana assured BRITT he was not in trouble, and asked if the officers could speak with him about his travels.

  B. BRITT was cooperative and stopped to speak with TFO Santana.

  C. TFO Santana explained to BRITT, among other things, the SDIA NTF interdiction team just wanted to be sure BRITT was not traveling with contraband such as illegal drugs, weapons, or large amounts of currency.

 11. BRITT accepted TFO Santana's invitation to continue
//

6

their conversation away from the crowds of SDIA passengers, in the privacy of the nearby SDIA NTF office.

    A.   BRITT walked with TFO Santana to the SDIA NTF office.

    B.   As BRITT and TFO Santana walked to the SDIA NTF office, TFO Santana asked BRITT whether he was traveling with anyone else.

    C.   BRITT, pointed out his was the only name on his boarding pass, and insisted he was traveling alone.

    D.   As BRITT and TFO Santana arrived at the NTF office, TFO Santana told BRITT other Task Force officers were speaking with his companion Truitt in the NTF office.

    E. TFO Santana again asked BRITT if he was traveling alone; and BRIT insisted he was.

  12. Upon arriving at the SDIA NTF office, TFO Santana again assured BRITT he was not in trouble and was free to leave.

    A.   BRITT told TFO Santana he traveled to San Diego to visit members of his family.

    B.   BRITT stated he was unemployed, and had been so for approximately a year.

    C.   BRITT identified his sole source of income as two (2) pieces of rental properties he owned.

    D.   BRITT told TFO Santana he was not transporting a large sum of cash or currency.

    E.   When TFO Santana suggested he would request a drug detection canine sniff BRITT'S large black nylon roller bag, BRITT responded, "Go ahead."

  13. On April 17, 2018, at the SDIA NTF office, in BRITT'S presence, TFO Billberry, a trained and experienced narcotic detection dog handler, used his trained and certified narcotic detection dog, "Snitch", to conduct an examination of BRITT'S large black nylon roller bag.

   A. TFO Billberry and Snitch were trained and certified as a dog handler and narcotic detection dog team.

   B. Snitch was trained to display a behavior or "alert" when he encountered the scents or odors of a variety of controlled substances.

   C. TFO Billberry was trained and experienced in recognizing Snitch's trained behaviors or alerts.

   D. When exposed to the large black nylon roller bag, Snitch alerted to the presence of the scent of one or more controlled substances emanating from the luggage.

   E. TFO Billberry observed the alert, told TFO Santana of the alert, and explained its significance.

  14. TFO Santana obtained a search warrant authorizing him to examine the contents of BRITT'S large black nylon roller bag.

  15. Acting under the authority of the search warrant, TFO Santana and DEA Special Agent Sharpe opened the large black nylon roller gag and examined its contents.

   A. Inside the roller bag, concealed among articles of clothing, TFO Santana encountered three (3) large vacuum-sealed, plastic-wrapped packages.

   B. Each of the three (3) large vacuum-sealed,

//

plastic-wrapped packages contained a large amount of U.S. currency.

    C. TFO Santana removed the currency from each of the three (3) bundles.

16. TFO Santana called upon TFO Billberry, the trained and experienced narcotic detection dog handler, and his trained and certified narcotic detection dog, "Snitch", to conduct an examination of the currency harvested from inside the large black nylon roller bag.

    A. When exposed to the currency, Snitch alerted to the presence of the scent of one or more controlled substances emanating from the currency.

    B. TFO Billberry observed the alert, told TFO Santana of the alert, and explained its significance.

17. The currency discovered in the large black nylon roller bag was combined, counted, and determined to have a dollar value of $34,500.00.

    A. The $34,500.00 discovered in the carry-on bag is the defendant $34,500 in currency.

18. TFO Santana gathered, examined, and counted the defendant $34,500 in currency found concealed inside the large black nylon roller bag.

    A. The defendant $34,500 in currency was made up of approximately 1,810 bills in a variety of denominations.

    B. The great majority of the bills, to wit, 1,314, were in the $20.00 denomination.

19. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug traffickers

and drug currency couriers. They knew illegal street drug sales were virtually always conducted as an exchange of drugs for currency.

    A. The most common denomination used in illegal street drug transactions was the $20.00 bill.

    B. Approximately 73% of the defendant $34,500 in currency was made up of $20.00 bills.

20. The defendant $34,500 in currency was seized for forfeiture by the DEA as currency constituting proceeds of the purchase(s) of controlled substances, and money possessed with the intent to be furnished in exchange for controlled substances.

21. The defendant $34,500 in currency constitutes money furnished or intended to be furnished in exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code

22. Alternatively, the defendant $34,500 in currency constitutes proceeds of, or proceeds traceable to, an exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

23. Alternatively, the defendant $34,500 in currency was used or intended to be used to facilitate an exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

24. As a result of the foregoing, the defendant $34,500 in currency is liable to condemnation and to forfeiture to the United States for its use in accordance with Title 21, United States Code, §881(a)(6).

25. The defendant $34,500 in currency is presently deposited within the jurisdiction of this Court.

WHEREFORE, the United States prays that due process issue to enforce the forfeiture of the defendant $34,500 in currency, and that due notice be given to all interested parties to appear and show cause why said forfeiture should not be declared.

DATED: October 19, 2018

ADAM L. BRAVERMAN
United States Attorney

s/ Bruce C. Smith
BRUCE C. SMITH
Assistant U.S. Attorney

<u>VERIFICATION</u>

I, Alberto Santana, state and declare as follows:

1. I am a Task Force Officer, assigned to a San Diego Integrated Narcotics Task Force, Team 8, and am one of the task force officers assigned to this investigation.

2. I have read the foregoing Complaint For Forfeiture and know its contents.

3. The facts set forth in the Complaint For Forfeiture are based upon my own knowledge or were facts furnished to me by other United States federal, state, or local law enforcement personnel, civilian witnesses, or other official Government sources.

Based on this information, I believe the allegations in the Complaint For Forfeiture to be true.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on October 19, 2018.

ALBERTO SANTANA, TFO
NTF TEAM 8

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America

### DEFENDANTS
$34,500.00 in U.S. Currency

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
AUSA Bruce C. Smith, Phone: (619) 546-8266
USAO, 880 Front Street, Room 6293, San Diego, CA 92101-8893

Attorneys (If Known)

'18CV2405 CAB AGS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☒ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | / ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
21 U.S.C. Section 881
Brief description of cause:
Narcotics trafficking

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE: 10/19/2018
SIGNATURE OF ATTORNEY OF RECORD: s/ Bruce C. Smith

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____